RUTLAND COURT OWNERS,
INC., Appellant,

v.

William TAYLOR, Appellee.

No. 09–CV–46.

District of Columbia Court of Appeals.

Argued May 18, 2010.
Decided July 8, 2010.

Thomas C. Mugavero, Falls Church, VA, with whom Kevin M. Kernan, was on the brief, for appellant.

Richard A. Samad for appellee.

Before REID and KRAMER, Associate Judges, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

Appellant, Rutland Court Owners, Inc., filed suit for possession of the cooperative apartment occupied by William Taylor af-

ter it revoked his shares in the wake of a dispute over the building's plan to provide extermination services for a bedbug infestation. After a bench trial, the court made findings of fact and ordered judgment in favor of Taylor based on its conclusion that he was entitled to an accommodation under the Fair Housing Act. 42 U.S.C. §§ 3601–3631 (2000). On appeal, appellant argues the trial court erred in finding a violation of the Fair Housing Act and in denying possession of the unit after the building owners revoked Taylor's shares in the cooperative. We affirm.

Appellant now argues that, although the trial court found Taylor to be eligible for an accommodation under the Federal Fair Housing Act, there was no accommodation requested or proposed and that no accommodation would have been reasonable under the circumstances. Appellant contends, therefore, that the trial court erred in allowing Taylor to maintain possession of his unit in the building. We review the legal determinations of the trial court here *de novo* but will accept the findings of fact made by the court unless they are clearly erroneous. *Lawlor v. District of Columbia*, 758 A.2d 964, 974 (D.C. 2000). The court's judgment based on the facts will not be disturbed unless it is plainly wrong or without evidence to support it. *Langon v. Reilly*, 802 A.2d 951, 953 (D.C.2002). As appellant "takes no issue with the Superior Court's findings of fact," we adopt those findings and set them forth here.

The Rutland Court building, located at 1725 17th Street, N.W., Washington, D.C., is organized as a cooperative association in which residents own shares of stock in Rutland Court Owners, Inc., a corporation owner. The corporation is managed by a Board of Directors (hereinafter "Board") and governed by corporate bylaws. Owners of shares of the corporation stock are entitled to reside in a corresponding unit of the building through an occupancy agreement. Appellee William Taylor was a shareholder in the cooperative and has resided in Unit 114 of the building since 1972. Taylor suffers from several mental health disorders, for which he takes medication, and has both a caseworker and a psychiatrist who are active in helping him manage his conditions.

During August 2007, the Board was notified by one resident that bedbugs had become a problem in her unit. Around August 25, 2007, Taylor notified the Board president that his unit also had bedbugs. The problem was discussed at the monthly Board meeting, on August 27, 2007, and a committee was formed to oversee extermination efforts. The committee established a resolution that "all units must be inspected ... by a professional exterminator" and that "[i]f a resident or owner refuses treatment by the exterminator hired by the Cooperative, the Committee shall solicit that person's alternative professional treatment plan, evaluate the plan to determine the effectiveness, and communicate its decision to the resident owner." On August 29, 2007, residents were notified by letter that Home Paramount Exterminators had been hired to inspect the building and begin treating for bedbugs on the first of September. Taylor raised various concerns about the exterminator selection and about the chemicals that would be used in the extermination process. In its letter to residents, the Board provided that alternative treatment plans could be submitted and, if deemed effective by the Board, could be used provided residents submitted proof within one week that the treatment was completed by a professional. Although Taylor indicated he had begun following an alternative treatment plan based on studies from Johns Hopkins University and the University of Kentucky, he did not submit a formal plan for alternative treatment of his unit.

Taylor allowed Home Paramount to inspect his apartment on September 1, 2007, but limited the extermination to only the bedroom. On September 25, 2007, the committee gave Taylor a detailed list of instructions for preparing his unit for further treatment, scheduled for two days later. Taylor refused to grant Home Paramount access to his unit on that date. In October, the property manager and Taylor's caseworker from Community Connections met with Taylor at the unit to discuss the general condition of the apartment, which was described as "extremely cluttered." After Taylor had made concerted but inadequate efforts to clean the unit, the property manager suggested having Elgen Cleaning Services assist him in the effort. The cleaning company did not gain access to Taylor's apartment on either of the two visits it made, although the property manager admitted that for at least one of the visits Taylor had not been notified and Taylor explained that he was unable to accommodate the second visit because it conflicted with a pre-existing appointment he had elsewhere. The property manager subsequently contacted a government-funded cleaning service, but this service left the unit shortly after arriving there for reasons that remain unclear.

On October 23, 2007, the committee informed Taylor by letter that if his unit was not cleaned and prepared for extermination by November 15th he would be fined $100. Taylor was subsequently contacted on November 8 and 14 by the property manager but again expressed his concerns about the health implications of the exterminations and asked to limit extermination to certain areas of the unit. On November 19, 2007, a new extermination company hired by the Board again inspected all building units for bedbugs and, upon entering Taylor's apartment, noted there were "extreme sanitation issues" including "garbage in the kitchen," "open cans of food," "papers and books stacked floor-to-ceiling" and a "serious infestation" of roaches and bedbugs. At trial, the owner of the company testified that treatment in such circumstances would have some effect on the infestation but that the clutter made it likely some bedbugs would survive and eventually cause a resurgence. He also testified that when he explained this, Taylor said he would need additional time to adequately prepare his apartment for extermination services.

On November 27, 2007, the Board proposed a resolution revoking Taylor's shares in the corporation. The resolution was passed at a stockholders' meeting held on December 12, 2007. Taylor was then given until January 12, 2008, to vacate his unit. Around the same time in mid-December, Taylor hired Terminix to carry out extermination services in his unit. At the time of trial, he testified the company had been to his unit approximately five times to conduct treatments, which were still ongoing. However, despite these extermination efforts, the Board's resolution required him to vacate the unit and a subsequent suit for possession of the unit was brought.

At trial in June 2008, Taylor's psychiatrist testified that he suffered from "bipolar disorder ... post-traumatic stress disorder and basic mood instability" which are treated with "a number of medications." He further testified that these conditions impede Taylor's ability to organize, concentrate, focus his attention, and stay motivated to complete tasks. These conditions had been further exacerbated by Taylor's recent unemployment beginning in June of 2007.

The trial court determined that Taylor had taken steps to eliminate the bedbugs and to clean his unit in conjunction with Terminix's extermination services, including vacuuming, throwing out "hundreds of

pounds of books" and cleaning out closets in the unit. However, it found that Taylor was in denial concerning the severity of the infestation and the need to temporarily vacate the unit for satisfactory extermination to take place. It then granted Taylor's motion for a stay to provide him with an additional opportunity to clean and exterminate the unit.

On June 27, 2008, the parties returned to court and both the property manager and Taylor agreed that, while improvements were made in the condition of the unit, there remained additional work to be done. The trial court issued an order for Taylor to temporarily vacate his unit by July 10, 2008, and instructed him to comply with treatment by Conquest Pest Control, which would arrange for intensive treatment of the unit over the course of eight weeks. The order also required Taylor to pay half of the extermination costs. This order was supplemented on July 7, 2008, to include compliance with the services of furniture movers and a cleaning crew prior to the extermination effort. The order was extended on July 30, August 12 and 22, and subsequently included sanctions based on Taylor's failure to fully comply with the extermination efforts.

On September 30, 2008, the court was informed that cleaning had been completed and that the extermination process had begun successfully and would be completed soon. A status hearing on December 12, 2008, confirmed that the eight-week extermination program was complete and Taylor was permitted to return to his unit. The court went on to conclude that Taylor was a protected individual under the Fair Housing Act even though his shares had been revoked by the Board, making him a tenant-at-will, because the Act, along with the District of Columbia Human Rights Act, applied to both owners and renters of residences. In analyzing

the requirements of the Fair Housing Act, the court relied on our analysis in *Douglas v. Kriegsfeld*, 884 A.2d 1109 (D.C.2005), to conclude that Taylor suffered from a qualified disability that the Board was aware of based on its interactions with him and the involvement of his caseworker. Further, it determined that Taylor's need for "additional time and professional assistance to clean and exterminate his unit" constituted a reasonable accommodation, which he requested when he asked for additional cleaning services to help prepare his unit for extermination. Although the Board did not provide the reasonable accommodation required by Taylor, it proceeded within three months to fine him and, two weeks later, to propose to revoke his shares. The trial court determined that these actions qualified as a discriminatory act against Taylor because the Board was capable of providing the reasonable accommodation, as shown by its ability to have the unit cleaned and exterminated while working with the court and Taylor during the suit for possession. Thus, the court concluded that, since the accommodation had been granted and the extermination completed, on the equities of the matter the judgment for possession should be denied.

The Federal Fair Housing Act prohibits discrimination against a tenant in "the provision of services or facilities" of a residential dwelling based on the tenant's "handicap," including mental impairments. 42 U.S.C. §§ 3602(h), –3604(b). Discrimination in this context includes failing to make "reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary [for the individual] to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). However, it does not require accommodations that "would constitute a direct threat to the health and safety of other individu-

als or ... [which would] result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9); D.C.Code § 2–1402.21(d)(5) (2001). To establish a defense claim to an eviction based on the denial of reasonable accommodation under the Fair Housing Act, the tenant must show (1) a disability, (2) that the landlord knew or should have known of the disability, (3) that an accommodation is necessary for the use and enjoyment of the apartment, (4) that the accommodation is reasonable, and (5) that the landlord refused the accommodation. *Douglas, supra,* 884 A.2d at 1129.

In *Douglas,* we applied the Fair Housing Act in the case of a tenant who had been given a 30–day notice to cure or quit her apartment for violating her lease covenant to "maintain the apartment in clean and sanitary condition." 884 A.2d at 1115. The landlord in *Douglas* described the apartment as containing garbage, rotting food, and dirty laundry, among other problems. *Id.* After the landlord filed an action for possession, the tenant sent a letter to the Department of Consumer and Regulatory Affairs requesting a reasonable accommodation under the Federal Fair Housing Act on the basis of her disability (a mood disorder) which made it difficult for her to properly maintain her apartment. *Id.* Her attorney subsequently sent a letter to the landlord requesting a reasonable accommodation in complying with the terms of her lease, though not specifying the exact accommodation being sought or detailing the assistance to be provided by the District of Columbia agencies. *Id.* at 1116. The trial court in *Douglas* rejected the tenant's disability discrimination defense because (1) the request was vague and came after the notice to cure or quit had expired and the landlord had proceeded to a suit for possession; (2) the premises were "a direct threat for the health and safety of others who live in the building;" and (3) there was no expert testimony

concerning whether the tenant had a disability and, if she did, whether it affected her ability to maintain her apartment. *Id.* at 1119. On appeal, we dismissed the notion that the request was not timely made where federal case law held that a discriminatory act can occur at any point prior to when a tenant is "actually evicted." *Id.* at 1121 (citing *Radecki v. Joura,* 114 F.3d 115, 116 (8th Cir.1997)). We found that, on the facts of a particular case, little "if any" expertise was required to draw an inference between the evidence of certain mental disabilities and the effect of those disabilities on the tenant's ability to maintain satisfactory living conditions. *Id.* at 1131. We also held that the exception for denying reasonable accommodations based on "a direct threat to the health or safety" of others was inapplicable until it had been determined that no reasonable accommodation could be made that would "sufficiently [ ] protect the health, safety, and property of others." *Id.* at 1125.

Appellant now argues that the *Douglas* case is distinguishable from this one. It argues that there was no evidence that Taylor's disability contributed to the condition of the apartment and that Taylor did not develop a sufficient proposal for his requested reasonable accommodation. Additionally, appellant claims that it did not deny a request for reasonable accommodation, either cleaning assistance or additional time for cleaning and extermination, because no reasonable accommodation was possible without placing the rest of the building at risk. In light of the trial court's findings below, these claims fail.

Under *Douglas,* there is "no specific diagnosis" needed to establish a disability under the Fair Housing Act. *Id.* at 1131. At trial, the court credited the testimony of Dr. Cohen that Taylor suffered from

"bipolar disorder ... post-traumatic stress disorder and basic mood instability" and was prescribed several medications for the control of those conditions. The doctor further testified that these conditions caused Taylor to have difficulty with motivation, organization, and concentration. The building manager also testified that he knew "there was a problem" with Taylor and the court itself took notice of Taylor's low energy level, unchanged and rumpled clothes, and obvious incomprehension of the magnitude of the problem with his apartment as indicative of his disability. This determination of Taylor's disability, and its connection to the condition of his unit within the cooperative building, is a fact-based one and was so clearly based on sufficient evidence and testimony that we may not disturb it here. Likewise, we hold the trial court had sufficient evidence to show that Taylor's disability was known to the Board and the manager of the building by their dealings with him and his caseworker.

■ Appellants claim that Taylor failed to develop a proposal for a reasonable accommodation. However, as the trial court noted, the request for an accommodation need not be in any particular form. *Douglas, supra,* 884 A.2d at 1122. In this case, the court found that Taylor did take "some steps" to eliminate the bedbug problem and had attempted to offer alternative treatment plans at various points prior to the suit for possession and throughout the proceedings in court. In fact, it found that he specifically requested additional time and "assistance in cleaning his apartment and readying it for extermination" prior to the time when the Board revoked his shares. On these facts, it is enough that the Board was aware of Taylor's need for an accommodation of additional time and cleaning assistance and the trial court had no basis for requiring that he develop a detailed proposal for the accommodation in order to avail himself of the reasonable accommodation defense.

■ The trial court went on to conclude that the reasonable accommodation was denied when it was requested, based on appellant's frustration with previously unsuccessful efforts to have Taylor clean and prepare his apartment for extermination—even though Taylor was often given only a day or two of notice that such services were scheduled. However, based on the trial court's orders on behalf of appellant, the trial court found that Taylor complied with the process of having the apartment cleaned and exterminated over a period of several months while the case was before the court. Thus, the trial court determined that appellant engaged in a discriminatory act by not making a more concerted effort to provide the reasonable accommodation prior to revoking his shares and bringing the suit for possession. We have no basis to overturn that decision.

■ Finally, appellant argues that the reasonable accommodation was, in fact, not reasonable because the additional time and cleaning assistance created a direct threat to the other residents of the building. We held in *Douglas* that the health and safety exception to reasonable accommodation does not apply until "after the trial court has evaluated the landlord's response to a requested accommodation." Here the trial court found appellant's initial response inadequate and to constitute a denial of the requested accommodation, but concluded that, with the assistance of the court, the accommodation was ultimately accomplished over roughly the same period that it took for the Board to go from addressing the bedbug problem in the building to revoking Taylor's shares in the cooperative. This process brought Taylor into compliance with the initial request of the Board that he clean and exterminate the

apartment, thus accomplishing the reasonable accommodation. On these facts, it is disingenuous to argue that the accommodation could not reasonably be granted when it has already been fully implemented under the guidance of the court. Further, appellant has alleged no actual threat to the health and safety of the other residents from the delay and certainly nothing that we find would approach or surpass the circumstances of the tenant in *Douglas.*

Accordingly, the judgment on appeal is *Affirmed.*[1]

---

1. We were informed at oral argument that the future of appellee's corporate shares must abide the outcome of further litigation.