*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 21-CV-0357

CAMILLE M. CAESAR, APPELLANT,

V.

WESTCHESTER CORPORATION, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB6766-16)

(Hons. Brian Holeman, Anthony C. Epstein, and Heidi M. Pasichow, Trial Judges)

Argued June 9, 2022                    Decided August 18, 2022

*Camille M. Caesar*, *pro se*, for appellant.

*Thomas C. Mugavero* and *Laura Hessler* for appellee.

Before EASTERLY, DEAHL, and ALIKHAN, *Associate Judges*.

ALIKHAN, *Associate Judge*: Appellee, the Westchester Corporation, owns and manages a cooperative apartment complex in Northwest D.C.[1] Appellant Camille M. Caesar lives at the Westchester and, in 2014, complained about what she

---

[1] Throughout this opinion, we refer to the corporation, its agents, and the building it owns and manages as "the Westchester."

considered to be excessive secondhand smoke entering her apartment. Although the Westchester is not a smoke-free building, it attempted to resolve the issue by conducting maintenance in Ms. Caesar's unit, and it allowed her to stay in one of the building's guest rooms while it did so. The Westchester typically requires residents to pay a nightly fee for use of the guest rooms and limits an individual's stay in these rooms to seven days absent an extension, but Ms. Caesar was initially permitted to stay for free while upgrades to her unit were in progress. The Westchester's smoke-proofing efforts did not satisfy Ms. Caesar, and when the Westchester asked her to return to her own apartment, she refused. After considerable back and forth, the Westchester informed Ms. Caesar in early 2016 that if she did not vacate the guest room, it would begin charging her the standard nightly fee. Ms. Caesar remained in the room and declined to pay.

The Westchester then brought a breach-of-contract action against Ms. Caesar, alleging that her failure to surrender the guest room and/or pay the nightly fee violated her cooperative agreement. Ms. Caesar counterclaimed, seeking $38 million in damages, alleging breach of the Westchester's fiduciary duties to her, housing discrimination, breach of the covenant of quiet enjoyment, and breach of the implied warranty of habitability. The trial court granted summary judgment to the Westchester on all claims. After a bench trial on the remedy, the court awarded the Westchester $235,860 in damages, $218,741.28 in attorney's fees and costs, and

a permanent injunction requiring Ms. Caesar to leave the guest room. Ms. Caesar now appeals both the grant of summary judgment and the remedy imposed.

While we cannot endorse every aspect of the trial court's analysis, we ultimately agree that summary judgment was properly granted to the Westchester on both its contract claim and Ms. Caesar's counterclaims. We also affirm the award of a permanent injunction and fees and costs. But we disagree with the trial court's damages calculation. Instead of remanding, however, we exercise our discretion to correct the trial court's error and direct it to downwardly adjust the Westchester's damages to $227,810 from the $235,860 originally awarded.

## I.     Facts

The Westchester is a Delaware corporation that owns and manages an apartment complex in the District of Columbia. It is structured as a cooperative, which means that "owners" of apartments in the complex do not actually own their units outright; instead, they own shares in the corporation and have contracts for the perpetual use of their individual apartments. One consequence of this structure is that, like members of any corporation, the Westchester's shareholders are owed fiduciary duties by the Westchester's board and officers. *See Willens v. 2720 Wisc. Ave. Coop. Ass'n*, 844 A.2d 1126, 1136 (D.C. 2004).

In addition to its member-owned units, the Westchester maintains 10 guest rooms that it makes available to members and their guests. Its rules and regulations limit an individual's continuous occupancy of a guest room to "a maximum of seven days with extension possible subject to the availability of rooms." While the rules and regulations do not specify the cost of renting a guest room, they make clear that there is a cost, stating that guest-room "[r]ates are nominal," and "[p]ayment for the room . . . [is] billed to the Member making the reservation." The Westchester's management sets these rates, and it is undisputed that in 2016 the daily rate was $110, increasing to $125 per day in 2017, where it remains today.

The Westchester does not always enforce its guest-room rules. In the past, it has informally allowed members to stay in guest rooms temporarily and free of charge when the member's unit was undergoing significant maintenance. But there is no record of any member besides Ms. Caesar remaining in a guest room for more than 30 days under such an arrangement.

Ms. Caesar moved into the Westchester in 1995. Like other members, she entered into a "Co-operative Apartment Perpetual Use And Equity Contract" with the Westchester. Among other things, this contract requires her to abide by the Westchester's rules and regulations.

Since 2005, Seymour Strongin has been Ms. Caesar's next-door neighbor. He smokes a pipe, or at least he did for a time. Although the Westchester permits members to smoke in their units, Ms. Caesar has long objected to Mr. Strongin's pipe smoking, alleging that it causes significant secondhand smoke to enter her apartment. Ms. Caesar has hypertension, a condition that she believes is aggravated by exposure to smoke. Ms. Caesar's dissatisfaction came to a head in February 2014, when she presented the Westchester with a doctor's note explaining that she could not be exposed to tobacco smoke, especially pipe smoke, for any reason. The note did not, however, say that Ms. Caesar was in fact being exposed to smoke in her apartment or that her hypertension had been caused or aggravated by secondhand smoke. Nevertheless, in response to this note, the Westchester offered Ms. Caesar the use of a guest room and attempted to make her apartment more smoke-resistant, although the extent and effectiveness of the measures it took remain disputed. After the Westchester completed remediation efforts that it considered adequate, it asked Ms. Caesar to return to her unit.

Unsatisfied with the Westchester's efforts, Ms. Caesar refused to vacate the guest room. While the record does not indicate what happened over the next year, on February 3, 2016, the Westchester wrote Ms. Caesar and asked that she leave the guest room or else it would begin charging her the standard nightly fee of $110, beginning on February 11. Ms. Caesar did not oblige. In her view, the smoke

situation remained untenable, and none of the additional measures the Westchester had taken had adequately addressed the problem. To this day, the parties disagree about whether smoke continues to enter Ms. Caesar's apartment and even about whether Mr. Strongin still smokes.

The Westchester began to bill Ms. Caesar on February 10, but she would not pay.[2] On April 19, the Westchester sent Ms. Caesar another letter, this time indicating that it would begin billing her if she did not vacate the guest room by April 30, notwithstanding the fact that it had already been billing her for more than two months. Thereafter, Ms. Caesar submitted a complaint to the District of Columbia Office of Human Rights ("OHR"), which administratively dismissed her complaint pursuant to 4 D.C.M.R. § 708.1(c) for failure to state a claim. She sought reconsideration, but OHR denied her request.

The impasse persisted, and in September 2016, the Westchester brought this action, alleging that Ms. Caesar had breached the terms of her cooperative agreement by refusing to leave the guest room and to pay the nightly fee. In response, Ms. Caesar asserted a number of affirmative defenses and counterclaims, alleging that the Westchester had breached the fiduciary duties it owed to her, unlawfully

---

[2] The Westchester has never explained why it began billing Ms. Caesar on February 10, after it had informed her repeatedly that it would begin billing her on February 11.

discriminated against her, breached the covenant of quiet enjoyment, and breached the implied warranty of habitability.

The Westchester filed a motion for summary judgment on all claims, which the trial court (Holeman, J.) granted in full. The court perceived no dispute of material fact about whether Ms. Caesar had breached her contract with the Westchester and found her defenses without merit. As for Ms. Caesar's counterclaims, the court concluded that expert medical testimony was necessary for Ms. Caesar to establish that Mr. Strongin's smoking and/or any action by the Westchester had caused or exacerbated her hypertension, but she had provided none. The Westchester, by contrast, had submitted an expert report by a toxicologist who had evaluated Ms. Caesar's medical records as well as scientific literature and offered the opinion that Ms. Caesar's hypertension was not the result of exposure to secondhand smoke emanating from an adjacent apartment. For this reason, and also because Ms. Caesar had not provided evidence to counter the Westchester's additional expert report opining that it had not violated any fiduciary duties owed to her, the court granted summary judgment on Ms. Caesar's fiduciary duty claim. It reached the same result with respect to her covenant of quiet enjoyment claim, although it offered little additional explanation. The court did not mention, and thus never addressed, Ms. Caesar's claim for breach of the implied warranty of habitability.

The court further held that the election-of-remedies doctrine jurisdictionally barred Ms. Caesar's counterclaim for housing discrimination. Because Ms. Caesar had brought the claim administratively and it "d[id] not appear that [her] complaint . . . was dismissed on grounds of administrative convenience or that Ms. Caesar withdrew the complaint with DCOHR," the trial court concluded that she could not now bring the claim in a judicial forum.

Despite granting summary judgment to the Westchester, the trial judge closed the case without fashioning a remedy. Ms. Caesar then (unsuccessfully) sought vacatur of summary judgment, and the Westchester sought to reopen the case for a determination of remedy. After the case made a brief and uneventful visit to this court, the trial court (Epstein, J.) reopened it to determine the appropriate remedy. Before a new judge (Pasichow, J.), the trial court sua sponte reconsidered the grant of summary judgment, focusing specifically on whether Ms. Caesar had been made aware of the Westchester's rules and regulations governing use of the guest rooms and the nightly fees. Satisfied after further briefing and evidentiary submissions that she had been, the court declined to disturb summary judgment. After a bench trial, the court awarded the Westchester damages of $235,860. It also awarded the Westchester $218,741.28 in attorneys' fees and costs, as well as a permanent injunction requiring Ms. Caesar to vacate the guest room. This appeal followed.

## II.  Standard of Review

We review grants of summary judgment de novo and apply the same standard as the trial court: a party is entitled to summary judgment "only upon demonstrating that 'no genuine issue of material fact remains for trial' and that judgment is warranted 'as a matter of law.'"  *MobilizeGreen, Inc. v. Cmty. Found. for the Cap. Region*, 267 A.3d 1019, 1024 (D.C. 2022) (quoting *Phenix-Georgetown, Inc. v. Charles H. Tompkins Co.*, 477 A.2d 215, 221 (D.C. 1984)).  Accordingly, we will reverse a grant of summary judgment if, but only if, "the record would permit a reasonable fact-finder to properly render a verdict in the non-moving party's favor."  *Id.*  In assessing whether or not this is the case, we "examine all evidence in the light most favorable to the non-moving party."  *Id.* (internal quotation marks omitted).

## III.  Analysis

### A.  The Westchester's Breach-of-Contract Claim

We agree with the trial court that there is no genuine dispute of material fact about whether Ms. Caesar breached her contract with the Westchester.  A successful breach-of-contract claim requires: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).  These elements are satisfied here.  We have no doubt that the parties' "Co-operative Apartment Perpetual Use And Equity Contract" was a valid contract

that imposed on Ms. Caesar a duty to follow the Westchester's rules and regulations. These rules and regulations limit guest room occupancy to "a maximum of seven days with extension possible subject to the availability of rooms." They also make perfectly clear that members are required to pay for their use of a guest room. Neither the contract nor the rules and regulations it incorporates sets the rate to be charged, but no one contests that it is for the Westchester to set these rates and that it did so. Ms. Caesar occupied the guest room for approximately seven years, at least five of them after the Westchester first asked her to vacate it. She refused to pay for any of this time. She therefore breached the contract and caused the Westchester a financial injury in so doing.

Neither of the affirmative defenses Ms. Caesar presses on appeal relieves her of liability. First, she contends that the Westchester waived its right to enforce its guest-room rules against her. Waiver is the "voluntary relinquishment of a known right." Restatement (Second) of Contracts § 84 cmt. b (Am. L. Inst. 1981). In the breach-of-contract context, waiver can prevent a party from enforcing a contract term if that party previously has indicated its intent to abandon its right to do so, either expressly or through its course of conduct. *See SJ Enters., LLC v. Quander*, 207 A.3d 1179, 1184 (D.C. 2019). But waiver is not an all-or-nothing, for-all-time proposition. A party that has waived a contract term "may retract the waiver by notifying the other party that strict compliance with the term waived will be required

unless the retraction would be unjust in light of a material change of position undertaken in reliance on the waiver."  13 *Williston on Contracts* § 39:20 (4th ed. 2013).

So far as we can see, Ms. Caesar thinks that the Westchester waived its right to enforce its rules and regulations pertaining to the guest room in either of two ways: (1) allowing other members to stay in guest rooms gratis while their units underwent maintenance; or (2) allowing her to remain in the room without charge for two years, from February 2014 to February 2016.  The problem with the first theory is that the longest the Westchester had previously allowed a member whose apartment was undergoing repairs to stay in a guest room was one month.  That limited forbearance did not evince any intention on the Westchester's part to abandon its right to enforce its rules against any member indefinitely.  It therefore did not effect a waiver of the Westchester's right to bill Ms. Caesar or to ask her to vacate the guest room under the circumstances of this case.  As for the second theory, even if we assume for the sake of argument that the Westchester had initially waived its right to strictly enforce its guest-room rules against Ms. Caesar by allowing her to remain in the room without charge until February 2016, it thereafter made clear that it was retracting any such waiver by sending repeated requests that she vacate the guest room or begin paying for it.  We also perceive no material change in position on Ms. Caesar's part in the interim that made such retraction unjust.

Ms. Caesar's argument that she is entitled under fair housing law to use the guest room as a reasonable accommodation because of her respiratory disability fares no better. Under the District of Columbia Human Rights Act ("DCHRA"), it is "unlawful discrimination" against a person with a "disability" for a landlord to "refus[e] to make reasonable accommodations in rules, policies, practices, or services, when these accommodations may be necessary to afford" such person "equal opportunity to use and enjoy a dwelling." D.C. Code § 2-1402.21(d)(3)(B). The Federal Fair Housing Act contains materially identical language. 42 U.S.C. § 3604(f)(3)(B). A claim for the denial of a reasonable accommodation can provide a defense to a landlord's action for possession, *see Rutland Ct. Owners, Inc. v. Taylor*, 997 A.2d 706, 710-11 (D.C. 2010), and, we will assume for present purposes, to the Westchester's breach-of-contract claim. To make out a prima facie case of reasonable-accommodation discrimination, a claimant must show: "(1) a disability, (2) that the landlord knew or should have known of the disability, (3) that an accommodation is necessary for the use and enjoyment of the apartment, (4) that the accommodation is reasonable, and (5) that the landlord refused the accommodation." *Id.* at 711.

Without otherwise passing on the merits of Ms. Caesar's reasonable-accommodation defense, we hold that it at least fails at prong three—the requirement that use of the guest room be "necessary to afford" Ms. Caesar "equal opportunity

to use and enjoy" her dwelling. D.C. Code § 2-1402.21(d)(3)(B); 42 U.S.C. § 3604(f)(3)(B). This necessity prong is a causation requirement; it requires a claimant to demonstrate that "but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1129 (D.C. 2005) (en banc) (quoting *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1155 (9th Cir. 2003)). And in "medically complicated cases" like this one, "proof of causation normally requires medical opinion testimony" of some kind. *Lasley v. Georgetown Univ.*, 688 A.2d 1381, 1384 (D.C. 1997); *see Am. Univ. v. D.C. Comm'n on Hum. Rts.*, 598 A.2d 416, 423 (D.C. 1991). This admonition is by no means universal, *Douglas*, 884 A.2d at 1131 n.50, but it is particularly apt where the causation question concerns the extent to which some allegedly harmful conduct impacted an injury or disability also brought about or exacerbated by some other cause, given the difficulties of parsing out multiple causation and incremental damage, *see Baltimore v. B.F. Goodrich Co.*, 545 A.2d 1228, 1231 (D.C. 1998); *Williams v. Patterson*, 681 A.2d 1147, 1150 (D.C. 1996); *Gray Line, Inc. v. Keaton*, 428 A.2d 360, 362 (D.C. 1981).

Ms. Caesar's reasonable-accommodation defense cannot survive summary judgment because it presents complex issues of medical causation that she failed to support with medical evidence. Hypertension has many possible causes and aggravators, and Ms. Caesar was required to provide something more than her own

assertions to validate her claims that Mr. Strongin's smoking exacerbates her condition and that staying in the guest room alleviates it. She did not. The Westchester, by contrast, submitted expert testimony that tended to support its position that there was no causal relationship between Mr. Strongin's smoking and Ms. Caesar's health. In the absence of any comparable evidence in the record going the other way, summary judgment was appropriate.

## B. Ms. Caesar's Counterclaims

### 1. Breach of fiduciary duty

We affirm the trial court's grant of summary judgment on Ms. Caesar's counterclaim for breach of fiduciary duty for similar reasons as we rule for the Westchester on the contract claim. A plaintiff alleging a breach of fiduciary duty must show: (1) the existence of a fiduciary relationship with the defendant; (2) breach of a duty imposed by that fiduciary relationship; and (3) an injury caused by such breach. *See* Restatement (Second) of Torts § 874 (Am. L. Inst. 2022). Ms. Caesar contends that the Westchester breached the duties it owes to her by "knowingly, flagrantly, maliciously, and notoriously permitt[ing] a pipe smoker, who continues to smoke, to move into the apartment next to [hers]," despite being "fully aware" of her maladies.

The difficulty for Ms. Caesar is once again causation. Whether the Westchester caused her any injury through any breach of its fiduciary duties depends on an antecedent determination that Mr. Strongin's secondhand smoke injured her. For the reasons already given, medical opinion testimony was necessary to prove that latter proposition, but Ms. Caesar presented none. Because there is no genuine dispute of material fact about whether Mr. Strongin's smoking injured Ms. Caesar, there is necessarily no genuine dispute concerning the Westchester's conduct.

### 2. Housing discrimination

Ms. Caesar also asserts that the Westchester denied her the right to live on an equal basis with the other shareholder-residents "due to her race and disability" and that as a result she "has incurred additional damages as a result of harassment and further breaches of fiduciary duty owed by Plaintiff to Defendant as a shareholder and landlord." It is not entirely apparent whether this statement is meant as a standalone housing discrimination claim or another claim for breach of fiduciary duty. The trial court treated it as the former and held that the election-of-remedies doctrine jurisdictionally barred the claim because Ms. Caesar had already administratively pursued a claim for this same conduct before OHR.

The trial court's determination was in error. It is true that the DCHRA "requires complainants to choose between an administrative or a judicial forum in

which to pursue their claims." *Carter v. District of Columbia*, 980 A.2d 1217, 1223 (D.C. 2009). Resort to an administrative forum therefore precludes resort to a judicial one for the same discriminatory practice claim, and vice versa. D.C. Code § 2-1403.16(a). But the statute also makes clear that where OHR "has dismissed [a] complaint on the grounds of administrative convenience," a complainant "maintains all rights to bring suit as if no complaint had been filed." *Id.*

That is what happened here. OHR "administratively dismissed" Ms. Caesar's complaint for failure to state a claim pursuant to 4 D.C.M.R. § 708.1(c). While we recognize that the phrase "failure to state a claim" is typically associated with a merits determination, OHR's denial of Ms. Caesar's request to reopen her case made clear that in this instance OHR had "administratively dismissed the matter *without making a determination on the merits*," and therefore Ms. Caesar could "file a private cause of action in D.C. Superior Court." OHR's characterization of its dismissal is consistent with § 708.1's description of dismissals under its subsections as dismissals for "administrative reasons." Our precedent has also recognized that dismissals under Section 708.1 can be for administrative convenience. *See Timus v. D.C. Dep't of Hum. Rts.*, 633 A.2d 751, 760 n.12 (D.C. 1993); *id.* at 773-74 & n.7 (Rogers, C.J., concurring in part and dissenting in part); *id.* at 780 (Appendix to opinion of Rogers, C.J., concurring in part and dissenting in part). In short, OHR's disposal of Ms. Caesar's claim left her right to file a lawsuit unimpaired.

Despite the trial court's mistake, we hold that summary judgment is nevertheless appropriate on this counterclaim on the alternate ground that it fails on the merits. *See Nat'l Ass'n of Postmasters of U.S. v. Hyatt Regency Wash.*, 894 A.2d 471, 474 (D.C. 2006) ("Where there will be no procedural unfairness, 'we may affirm a judgment on any valid ground, even if that ground was not relied upon by the trial judge or raised or considered in the trial court.'" (quoting *In re O.L.*, 584 A.2d 1230, 1232 (D.C. 1990))). We discern no procedural unfairness with affirming on this alternate ground, because Ms. Caesar obviously had every incentive to demonstrate in the trial court that she had a viable housing-discrimination claim, and when the Westchester briefed the merits of the claim on appeal, Ms. Caesar elected not to respond in her reply brief.

No matter what permutation of this counterclaim we assume, nothing in the record creates a question for a jury. If we treat the claim as one for a reasonable accommodation, it cannot survive summary judgment for the same reason that Ms. Caesar's reasonable-accommodation affirmative defense cannot: the lack of medical evidence on the issue of causation. If we treat the claim as a claim of disparate-treatment discrimination under the DCHRA, summary judgment is likewise merited because nothing in the record indicates that the Westchester treated Ms. Caesar unequally relative to any other member of the cooperative. *See, e.g.*, D.C. Code § 2-1402.21(a)(1) (prohibiting the "require[ment] [of] different terms" for a

18

transaction in real property based on a person's race or disability); *id.* § 2-1402.21(a)(4) (prohibiting the "refus[al] or restrict[ion] [of] facilities, services, repairs or improvements for a tenant or lessee" on the basis of a person's race or disability); *id.* § 2-1402.21(d)(2) (making it unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with the dwelling" because of such person's disability). At the time of the initial grant of summary judgment, Ms. Caesar had provided no evidence that the Westchester had treated her unequally. Her brief in opposition to summary judgment seemed to suggest that the Westchester had treated her unequally by suing her for breach of contract. That contention is unavailing, not least because, as we affirm today, the Westchester's claim was meritorious. But even if we consider the additional evidence that Ms. Caesar submitted in response to the trial court's reconsideration of summary judgment— notwithstanding the fact that this evidence was largely unresponsive to the question the trial court was reconsidering—the result is the same. Perhaps the strongest piece of evidence in Ms. Caesar's favor is her deposition testimony that she has been asked to make less noise in her apartment, while the Westchester still allows Mr. Strongin to smoke. But these two behaviors are not sufficiently analogous to create an issue about inequitable treatment, and Ms. Caesar provided few other specific facts on the

noise issue, what was asked of her, and how the Westchester handled the situation.[3] Finally, the lack of a factual dispute regarding inequitable treatment would also justify summary judgment if we treated Ms. Caesar's claim as one for breach of the fiduciary duty of loyalty. *See Willens*, 844 A.2d at 1136.

### 3.  Covenant of quiet enjoyment

We also affirm the trial court's grant of summary judgment to the Westchester on Ms. Caesar's counterclaim for breach of the covenant of quiet enjoyment. While the trial court's analysis of this issue was cursory, we again exercise our discretion to affirm based on our independent review of the record.

A common-law obligation owed by landlords to tenants, the covenant of quiet enjoyment protects a tenant's possession of her property. *See Hyde v. Brandler*, 118 A.2d 398, 399-400 (D.C. 1955). Because the covenant "goes only to the possession" of property, *id.* at 400, a violation of it requires either an actual interference with a tenant's right to possess her property or a constructive eviction, *see Sobelsohn v. Am. Rental Mgmt. Co.*, 926 A.2d 713, 716 (D.C. 2007). A constructive eviction in turn entails "some wrongful act or omission by the landlord" that renders a property "uninhabitable . . . for [its] intended purposes." *Bown v. Hamilton*, 601 A.2d 1074,

---

[3] What is more, the Westchester has rules concerning noise but does not prohibit an individual from smoking in his or her own unit.

1077 n.9 (D.C. 1992) (quoting Roger A. Cunningham et al., *The Law of Property* 296 (1984)). Essentially, although "[t]he tenant is not physically evicted . . . he might as well be." *Id.* In this context, "[a] landlord is not liable to his tenants for interference by third persons with the tenant's possession, absent any wrongful acts or omissions by the landlord." *Int'l Comm'n on Eng. in the Liturgy v. Schwartz*, 573 A.2d 1303, 1305 (D.C. 1990) (quoting *Rittenberg v. Donohue Constr. Co.*, 426 A.2d 338, 342 (D.C. 1981)).

Because the Westchester did not directly interfere with Ms. Caesar's actual possession of her apartment—indeed, it initiated this lawsuit to return her to it—Ms. Caesar must demonstrate that there is a genuine dispute of material fact regarding whether she was constructively evicted. She has not done so. Her core complaint is really with Mr. Strongin, whose smoking she claims renders her apartment uninhabitable, rather than with the Westchester. And the Westchester is not liable under a constructive eviction theory for Mr. Strongin's actions, absent some independent wrongful action or omission on its part. *Id.* But Ms. Caesar has not provided evidence sufficient to survive summary judgment on the issue of whether the Westchester itself committed any wrongful act or wrongfully failed to act. As a building that allows tenants to smoke in their individual units, the Westchester was not obligated to stop Mr. Strongin from smoking in his apartment or to guarantee Ms. Caesar a completely smoke-free living situation. Assuming that the Westchester

nevertheless was required to manage the level of secondhand smoke entering the apartments of non-smoking residents like Ms. Caesar, we cannot conclude on this record that its efforts to do so were so deficient as to be wrongful. It is undisputed that it took measures to make Ms. Caesar's unit less permeable to smoke and that it allowed Ms. Caesar to live for free in a guest room for nearly two years. Ms. Caesar's submission appears to be that, even so, the amount of smoke entering her apartment obligated the Westchester to do more. To determine whether this was true, the Westchester offered to spend several thousand dollars to have Ms. Caesar's apartment tested for the presence of smoke and engaged in an extensive correspondence with her about scheduling such a test. Ultimately, however, Ms. Caesar refused to allow testing to proceed, apparently because she did not consider the testing methods to be employed reliable. She did not and has not suggested any alternative testing approach or methodology.

We cannot identify anything the Westchester did wrong during this series of events. It took all measures that could reasonably have been expected of it under the circumstances. And when it attempted to verify that these measures were adequate, Ms. Caesar refused to allow it to do so. It was Ms. Caesar's right to refuse to permit her apartment to be tested for the ongoing presence of smoke. But, having exercised that right, she cannot now claim, absent any evidence but her own assertions, that the Westchester wrongfully failed to respond to her concerns.

#### 4. Implied warranty of habitability

The trial court failed entirely to consider Ms. Caesar's counterclaim for breach of the implied warranty of habitability. As part of our de novo review, we will consider the claim in the first instance. Having done so, we hold that summary judgment is appropriate.

The warranty of habitability is a term implied in every lease, and it requires a landlord to "exercise reasonable care to maintain rental premises in compliance with the housing code." *George Wash. Univ. v. Weintraub*, 458 A.2d 43, 49 (D.C. 1983). A violation of the housing code—or at a minimum some applicable law—is an essential element of such a claim. *Winchester Mgmt. Corp. v. Staten*, 361 A.2d 187, 190-91 (D.C. 1976); *see Sobelsohn*, 926 A.2d at 715-17. Summary judgment is in order here because Ms. Caesar has not pointed to a single provision of the District's Housing Code or any other statute or regulation that the Westchester violated. *See generally* 14 D.C.M.R. § 400, *et seq.* While on appeal she cites testimony from the remedies-only trial about an investigation into housing code violations related to her apartment, this testimony does not help her. Most basically, evidence presented for the first time at a trial about the *remedy* cannot be considered when reviewing a grant of summary judgment on *liability*. *See* 10A Charles A. Wright et al., *Federal Practice and Procedur*e § 2716 (4th ed. 2022). Moreover, as far as we can tell, the

investigation in question appears to be about water damage and not related to secondhand smoke.

* * *

In sum, we affirm the trial court's grant of summary judgment to the Westchester in full.

## IV.   Remedy

Remaining is the issue of remedy.  The trial court imposed the remedy here after a bench trial, and we review its findings of fact for clear error, its legal conclusions de novo, *Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81, 89 (D.C. 1994), and its issuance of an injunction for abuse of discretion, *Ifill v. District of Columbia*, 665 A.2d 185, 187 (D.C. 1995).

Ms. Caesar raises a number of objections to the trial court's damages award, none of which is availing.  Her first argument is that the Westchester failed to mitigate its damages and therefore that the damages she owes should be reduced by the amount that could have been mitigated.  The duty to mitigate damages "bars recovery for losses suffered by a non-breaching party that could have been avoided by reasonable effort and without risk of substantial loss or injury."  *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 586 (D.C. 2015) (quoting *Crough, Inc.*

*v. Dep't of Gen. Servs. of D.C.*, 572 A.2d 457, 466 (D.C. 1990)). The purpose of the doctrine is "'to put the injured party in as good a position as full performance of the contract would have' with 'the least necessary cost to the defendant.'" *Sizer v. Lopez Velasquez*, 270 A.3d 299, 302-03 (D.C. 2022) (quoting 11 *Corbin on Contracts* § 57.11 (2021)). The injured party is therefore "expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements." *Id.* at 303 (quoting Restatement (Second) of Contracts § 350 cmt. b (Am. L. Inst. 1981)). But the breaching party bears the burden of proving that the non-breaching party did not make reasonable efforts to mitigate damages. *Norris v. Green*, 656 A.2d 282, 287 (D.C. 1995).

Ms. Caesar contends that the Westchester unreasonably failed to mitigate damages because it did not do one or more of the following: (1) require Mr. Strongin to change his smoking habits; (2) allow her to purchase the guest room outright; (3) charge her only for the actual costs associated with her living in the guest room, defined to include towel service and soap, and offset those costs against "services and maintenance, including utilities, which [Ms. Caesar] did not receive but for which she paid in full through her cooperative fees of more than $1320.00 per month;" (4) help her move into a different unit in the building; (5) institute a no-smoking policy at the Westchester; and (6) "work[] with its long-term auditors to fashion a solution." We disagree. Options (1), (5), and (6) have nothing to do with

damages mitigation. Option (3), billing Ms. Caesar only for actual costs, not the costs she contractually owed, would represent a settlement or compromise, not mitigation of damages. *Cf. Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 n.18 (1982) (explaining, in the employment context, that a "claimant's obligation to minimize damages . . . does not require him to settle his claim against [his] employer"). Ms. Caesar has also failed to prove that options (2) and (4)—selling her the guest room or allowing to her to move to a different unit—were reasonable options that would have provided the Westchester its expectation under the parties' lease agreement.

We also reject Ms. Caesar's arguments that the Westchester was required to prove its actual damages—the incremental costs it incurred and revenues from other potential tenants on which it lost out because of Ms. Caesar's extended guest room stay—and to net out of damages any costs it saved due to her breach and the co-op fees she paid during the period of her breach. We see no reason why the Westchester was not entitled to expectation damages—what it would have received had Ms. Caesar honored her contractual obligations. *See* Restatement (Second) of Contracts § 344 cmt. a (Am. L. Inst. 2022). Its actual costs are therefore of no consequence. As for damages offsets, because Ms. Caesar failed at trial to prove that the Westchester saved any money because of her breach of contract, she cannot now contend that the damages award must reflect any such savings. The lease agreement

also indicates that guest room fees are distinct from co-op fees, so there is no reason to deduct the co-op fees she paid from the damages she owes.

All of that said, the trial court's damages calculation was not without fault. The court awarded the Westchester damages of $235,860. [4] It claimed to reach this result by multiplying the nightly rate for the guest room—$110 per day in 2016 and $125 per day from January 1, 2017, onward—by the days Ms. Caesar resided there after receiving notice that the Westchester intended to charge her, February 10, 2016, until May 25, 2021. Even if this were the correct ranges of dates, the proper damages figure would be $236,610, not $235,860. But it is not the correct range of dates. Based on our review of the record, damages began to accrue on April 30, 2016, not February 10, 2016. To be sure, the Westchester sent Ms. Caesar several letters indicating that it would begin billing her on February 11, 2016.[5] But the parties' correspondence continued after that date, and on April 19, 2016, the Westchester told Ms. Caesar that she needed to vacate by April 30 or it would begin charging her. Its letter said specifically: "If you do not wish to incur Guest Room charges, you are

---

[4] The trial court awarded the Westchester $236,735 in its May 25, 2021, order of judgment. Two days later, on May 27, 2021, the court issued a subsequent order awarding the Westchester $235,860 in damages, superseding the original figure. We note but do not address this discrepancy, as we decline to uphold either amount.

[5] Again, it is not clear why the Westchester provided Ms. Caesar a February 11 move-out date but began charging her on February 10.

to vacate Guest Room 637B and submit your key to it to The Westchester's front desk no later than *April 30, 2016 at Noon*." The Westchester therefore indicated its intent to strictly enforce its guest-room rules starting that evening, and damages are only appropriate for the time she spent in the room after that. Based on that understanding, we remand with instructions that the trial court reduce the damages award to $227,810, representing $110 per day for each day from April 30, 2016 through December 31, 2016, and $125 per day for each day from January 1, 2017 through May 25, 2021. We leave the attorneys' fees and costs awards unchanged.

Finally, we affirm the trial court's issuance of a permanent injunction, although we correct an analytical mistake it made in so doing. Ms. Caesar is correct that the trial court committed an error by applying the legal test for the issuance of a *preliminary* injunction when it should have applied the test for the issuance of a *permanent* injunction. To receive a permanent injunction, a plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The test for the issuance of a preliminary injunction is similar, but instead of analyzing whether the

plaintiff has an adequate remedy at law, the court assesses whether the plaintiff is likely to succeed on the merits of the case. *Wieck v. Sterenbuch*, 350 A.2d 384, 387 (D.C. 1976); *see Ifill*, 665 A.2d at 187-88. The likelihood-of-success-on-the-merits inquiry is unnecessary where, as here, the plaintiff has already succeeded on the merits and seeks permanent relief. Nevertheless, because we identify no abuse of discretion on the part of the trial court in its analysis of the three prongs the tests have in common, and because we conclude that the Westchester lacks an adequate remedy at law, we see no need to remand the case for the trial court's reconsideration in the first instance.

On this latter point, Ms. Caesar proved herself quite committed to remaining in the guest room and did not vacate it until the trial court issued its injunction, despite her loss on summary judgment. Her breach of contract was persistent and ongoing, and we are not confident that in the absence of an injunction she would not take up residence in the guest room once again. Moreover, even if Ms. Caesar were willing to pay the nightly rate in perpetuity—which we have no reason to believe is the case—the situation would still be untenable. The Westchester has 10 guest rooms it makes available to all residents, and it in general limits the stays of even paying residents to seven days, presumably so that other residents have an adequate opportunity to make use of the rooms. Ms. Caesar's indefinite occupation of one of these rooms, paid or not, is incompatible with this arrangement and would unfairly

disadvantage the Westchester's other residents and their guests. Damages are not thus not an adequate remedy. *See, e.g., Lucy Webb Haynes Nat'l Training Sch. for Deaconesses & Missionaries v. Geoghegan*, 281 F. Supp. 116, 117-18 (D.D.C. 1967) (holding that damages were inadequate and an injunction was warranted where a patient refused to vacate her hospital room, although she was "able and willing to pay whatever the hospital would charge," because permitting her to remain would "allow a diversion of [the hospital's] facilities to purposes for which they are not intended"); *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 158 (Iowa 1993) (affirming the issuance of a permanent injunction where the defendants "made no assurances that they would refrain from breaching [a] settlement agreement in the future"). Ms. Caesar's actions are not unlike a continuing trespass, a violation courts have often found it appropriate to enjoin permanently. *See, e.g., Geoghegan*, 281 F. Supp. at 117-18 (collecting cases); *R.I. Turnpike & Bridge Auth. v. Cohen*, 433 A.2d 179, 182 (R.I. 1981); *Wheelock v. Noonan*, 15 N.E. 67, 68-70 (N.Y. 1888); *Levisa Coal Co. v. Consolidation Coal Co.*, 662 S.E.2d 44, 62 (Va. 2008); *Water Works & Sewer Bd. of the City of Birmingham v. Inland Lake Invs., LLC*, 31 So.3d 686, 693 (Ala. 2009); *Evans v. Cote*, 107 A.3d 911, 915 (Vt. 2014). We therefore affirm the issuance of the injunction, this time under the correct standard.

**V.     Conclusion**

For the foregoing reasons, we affirm the trial court in all respects except the damages calculation, on which we remand with instructions to correct the damages amount to $227,810.

*So ordered.*